IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA OIL AND GAS ASSOCIATION; *et al.*,<br><br>        Plaintiffs,<br><br>vs.<br><br>NATIONAL MARINE FISHERIES SERVICE; *et al.*,<br><br>        Defendants. | Case No. 4:14-cv-00029-RRB |
| NORTH SLOPE BOROUGH,<br><br>        Plaintiff,<br><br>vs.<br><br>PENNY PRITZGER; *et al.*,<br><br>        Defendants. | Case No. 4:15-cv-00002-RRB |
| STATE OF ALASKA,<br><br>        Plaintiff,<br><br>vs.<br><br>NATIONAL MARINE FISHERIES SERVICE; *et al.*,<br><br>        Defendants. | Case No. 4:15-cv-00005-RRB |

## **MEMORANDUM DECISION**

## I.    DECISION APPEALED

On December 28, 2012, the National Marine Fisheries Service ("NMFS") and National Oceanic and Atmospheric Administration ("NOAA") of the Department of Commerce issued a final decision listing the Arctic subspecies of ringed seal (the *Phoca hispida hispida* subspecies) as threatened under the Endangered Species Act ("ESA") (hereinafter referred to as the "Listing Rule").[1] These consolidated actions challenge that decision.[2] The facts underlying the consolidated actions are well known to parties and a matter of public record. Accordingly, the facts will not be repeated herein except to the extent necessary to understand the decision of this court.

While the issues presented here appear complex, this dispute ultimately boils down to whether or not it was reasonable for NMFS to list the Arctic ringed seals as a "threatened species," while the population is strong and healthy, based primarily upon

---

[1] *Endangered and Threatened Species; Threatened Status for the Arctic, Okhotsk and Baltic Subspecies of the Ringed Seal and Endangered Status for the Ladoga Subspecies of the Ringed Seal*, 77 Fed. Reg. 76706–38 (December 28, 2012).

[2] Plaintiffs:  Plaintiffs in 4:14-cv-00029 are the Alaska Oil and Gas Association ("AOGA"), the American Petroleum Institute ("API"); and in 4:15-cv-00002 the North Slope Borough ("NSB"), Arctic Slope Regional Corporation ("ASRC"), Northwest Arctic Borough ("NAB"), NANA Regional Corporation ("NANA"), and Inupiat Community of the Arctic Slope ("Inupiat Community") (collectively "Northern Alaska Plaintiffs").

Defendants:  Defendants In 4:14-cv-00002 are the National Marine Fisheries Service ("NMFS") and Penny Pritzger, Secretary of Commerce; in 4:15-cv-00002 the Secretary of Commerce and NMFS; and in 4:15-cv-00005-RRB NMFS, National Oceanic and Atmospheric Administration ("NOAA"), Kathryn D. Sullivan, NOAA Administrator and Eileen Sobeck, Assistant NOAA Administrator (for convenience, unless the context clearly indicates otherwise, as used herein, "NMFS" refers to the federal defendants collectively).

Intervener:  The Center for Biological Diversity, Inc. ("CBD") has appeared as an intervener defendant in support of the listing in the consolidated action.

speculation as to what circumstances may or may not exist 80 to 100 years from now. For the reasons set forth below, the Court concludes that it was not.

## II.    PENDING MOTIONS

At **Docket 42** the Northern Alaska Plaintiffs have moved for summary judgment, which NMFS and CBD have opposed and cross-moved for summary judgment.[3] The Northern Alaska Plaintiffs have replied and opposed the cross-motions.[4]

At **Docket 50** the State of Alaska (hereinafter "State") has moved for summary judgment, which NMFS and CBD have opposed and cross-moved for summary judgment.[5] The State has replied and opposed the cross-motions.[6]

At **Docket 54** Plaintiffs AOGA/API have moved for summary judgment, which NMFS and CBD have opposed and cross-moved for summary judgment.[7] AOGA/API have replied and opposed the cross-motion.[8]

The Court, being fully advised in the matter, has determined that oral argument would not materially assist in resolving the issues presented. Accordingly, the requests for oral argument are **DENIED**.[9]

---

[3]  Dockets 60 (NMFS); 63 (CBD).

[4]  Docket 65.

[5]  Dockets 60 (NMFS); 63 (CBD).

[6]  Docket 66.

[7]  Dockets 60 (NMFS); 63 (CBD).

[8]  Docket 67.

[9]  D.Ak. LR 7.2(a)(3)[B].

## III.  JURISDICTION and VENUE

Jurisdiction is vested in this Court under 28 U.S.C. §§ 1331, 2201-02, 16 U.S.C. § 1540(g), and 5 U.S.C. §§ 553, 702–06.   Venue is proper under 29 U.S.C. § 1391(e).

## IV.  STANDARD OF REVIEW/ISSUES PRESENTED

Because the ESA does not supply a separate standard for review, this Court reviews claims under the standards of the Administrative Procedures Act ("APA").[10] The APA provides that an agency action must be upheld on judicial review unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[11] As applied to the ESA, the Ninth Circuit recently held:

> [. . . .]  As a reviewing court, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although our inquiry must be thorough, the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity," and we may not substitute our judgment for that of the agency. Where the agency has relied on relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence. Even [i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings.
> Under the ESA, the agency must base its actions on evidence supported by the best scientific and commercial data available. The determination of what constitutes the *best* scientific data available belongs to the agency's special expertise . . . . When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential. Absent superior data[,] occasional imperfections do not violate the ESA best available standard.

---

[10]  *San Luis & Delta–Mendota Water Auth. v. Jewel*, 747 F.3d 581, 601 (9th Cir. 2014) (citing *Bennett v. Spear*, 520 U.S. 154, 174 (1997)); *Oregon Natural Desert Ass'n v. Bureau of Land Mgmnt.*, 625 F.3d 1092, 1109 (9th Cir. 2010); *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990)).

[11]  5 U.S.C. § 706(2)(A).

The best *available* data requirement merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on. Essentially, FWS cannot ignore available biological information. Thus, insufficient . . . [or] incomplete information . . . does not excuse [an agency's] failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available where there was some additional superior information available. On the other hand, where the information is not readily available, we cannot insist on perfection: [T]he best scientific . . . data available, does not mean the best scientific data possible.[12]

The Ninth Circuit has made clear that a court's review of agency decisions under the APA is extremely narrow. Under § 706(2)(A), a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." When reviewing "under the arbitrary and capricious standard[,]" a court is deferential to the agency involved.[13] A court may not substitute its judgment for that of the agency:[14] as long as the agency states a rational connection between the facts found and the decision made it must be upheld.[15] This deference is particularly appropriate where the decision of the agency at issue "requires a high level of technical expertise."[16]

---

[12] *San Luis & Delta–Mendota Water Auth.*, 747 F.3d at 601–02 (internal citations and quotation marks omitted) (omissions and substitutions in the original).

[13] *Nat'l Ass'n of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

[14] *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

[15] *Home Builder's Ass'n of Northern Calif. v. United States Fish and Wildlife Svc.*, 616 F.3d 983, 988 (9th Cir. 2010) (quoting *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 875 (9th Cir. 2009).

[16] *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375–77 (1989); *see Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995).

This Court's review is limited to "the administrative record already in existence, not some new record made in the reviewing court."[17]

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry . . . .
> The fact-finding capacity of the district court is thus typically unnecessary to judicial review of agency decision making.[18]

Where, as here, the Court is reviewing an agency's interpretation of a statute, such as the ESA, the appropriate framework of review under *Chevron* is a two-step process: (1) first the court must look to the plain meaning of the statutory language, i.e., is it unambiguous; and (2) if ambiguous, whether the agency's interpretation of the statutory language is permissible.[19] In this case it is indisputable that the statute in question fails the "plain meaning" rule, it is ambiguous. "When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary [of Commerce]."[20] As the Ninth Circuit has found "[by] leaving an 'explicit gap' for agency promulgated regulations, the

---

[17] *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

[18] *San Luis & Delta–Mendota Water Authority*, 747 F.3d at 602 (internal citations and quotation marks omitted).

[19] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

[20] *Babbitt v. Sweet Home Chapter of Cmtys for Greater Oregon*, 515 U.S. 687, 708 (1995); *see* 16 U.S.C. § 1533(c)(1), *see also* 50 C.F.R. § 402.01(b) (re-delegating that authority to NMFS).

ESA expressly delegates authority to the [agency] to decide how such listing determinations are to be made."[21] Thus, this Court examines the Listing Rule before it under *Chevron's* second step, i.e., whether the agency's interpretation is permissible.[22]

**Applying the foregoing standards, the ultimate issue presented in this appeal is whether or not the decision to list the Arctic subspecies of ringed seal (the *Phoca hispida hispida* subspecies) as threatened under the ESA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." For the reasons set forth below, the Court concludes that in the absence of evidence of the current population level, the lack of projected decline in that population, and the failure to define an extinction threshold, the evidence is insufficient to support a finding that the Arctic ringed seals are threatened with extinction in the foreseeable future. This, coupled with the lack of any suggested efforts to protect the Arctic ringed seals, leads the Court to conclude that the decision to include the Arctic ringed seals as threatened was arbitrary, capricious and an abuse of discretion.[23]**

---

[21]  *Trout Unlimited v. Lohn*, 559 F.3d 946, 961 (9th Cir. 2009).

[22]  An agency determination qualifies under the second-step of the *Chevron* rule when it meets two requirements: (1) "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).

[23]  The Court agrees with NMFS that, despite a minor ambiguity, listing of the Arctic ringed seals is the only issue properly before the Court.

## V. DISCUSSION

### A. *Listing Rule*

NMFS provided the following summary:

**SUMMARY:** We, NMFS, issue a final determination to list the Arctic (*Phoca hispida hispida*), Okhotsk (*Phoca hispida ochotensis*), and Baltic (*Phoca hispida botnica*) subspecies of the ringed seal (*Phoca hispida*) as threatened and the Ladoga (*Phoca hispida ladogensis*) subspecies of the ringed seal as endangered under the Endangered Species Act (ESA). We will propose to designate critical habitat for the Arctic ringed seal in a future rulemaking. To assist us in this effort, we solicit information that may be relevant to the designation of critical habitat for Arctic ringed seals. In light of public comments and upon further review, we are withdrawing the proposed ESA section 4(d) protective regulations for threatened subspecies of the ringed seal because we have determined that such regulations are not necessary or advisable for the conservation of the Arctic, Okhotsk, or Baltic subspecies of the ringed seal at this time. Given their current population sizes, the long-term nature of the primary threat to these subspecies (habitat alteration stemming from climate change), and the existing protections under the Marine Mammal Protection Act, it is unlikely that the proposed protective regulations would provide appreciable conservation benefits.[24]

Plaintiffs challenge the following finding in the Listing Rule:

We have reviewed the status of the ringed seal, fully considering the best scientific and commercial data available, including the status review report. We have reviewed threats to these subspecies of the ringed seal, as well as other relevant factors, and considered conservation efforts and special designations for ringed seals by states and foreign nations. In consideration of all of the threats and potential threats to ringed seals identified above, the assessment of the risks posed by those threats, the possible cumulative impacts, and the uncertainty associated with all of these, we draw the following conclusions:

*Arctic subspecies:* (1) There are no specific estimates of population size available for the Arctic subspecies, but most experts postulate that the population numbers in the millions. (2) The depth and duration of snow cover are forecasted to decrease substantially throughout the range of the Arctic ringed seal. Within this century, snow cover is forecasted to be inadequate

---

[24] 77 Fed. Reg. 76706.

for the formation and occupation of birth lairs over most of the subspecies' range. (3) Because ringed seals stay with the ice as it annually advances and retreats, the southern edge of the ringed seal's range may initially shift northward. Whether ringed seals will continue to move north with retreating ice over the deeper, less productive Arctic Basin waters and whether the species that they prey on will also move north is uncertain. (4) The Arctic ringed seal's pupping and nursing seasons are adapted to the phenology of ice and snow. The projected decreases in sea ice, snow cover, and thermal capacity of birthing lairs will likely lead to decreased pup survival. Thus, within the foreseeable future it is likely that the number of Arctic ringed seals will decline substantially, and they will no longer persist in substantial portions of their range. We have determined that the Arctic subspecies of the ringed seal is not in danger of extinction throughout all of its range, but is likely to become so within the foreseeable future. Therefore, we are listing it as threatened.[25]

The ESA defines a threatened species as one that "is likely to become an endangered species within the foreseeable future through all or a significant portion of its range."[26]

**B.    *Applicable Statutes***

Section 4(a)(1) of the ESA provides:[27]

(a) **Generally**
    (1) The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:
            (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
            (B) overutilization for commercial, recreational, scientific, or educational purposes;
            (C) disease or predation;
            (D) the inadequacy of existing regulatory mechanisms; or

---

[25]  77 Fed. Reg. 76716.

[26]  16 U.S.C. § 1532(20); 50 C.F.R. § 424.01(m) (10-1-12).

[27]  16 U.S.C. § 1533(a)(1).

(E) other natural or manmade factors affecting its continued existence.

It is evident that in this case that § 4(a)(1)(B), (C), and (D) are clearly inapplicable, leaving

§ 4(a)(1)(A) and (E).

Section 4(b)(1) of the ESA provides in relevant part:[28]

(b) **Basis for determinations**
(1)
(A) The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.
(B) In carrying out this section, the Secretary shall give consideration to species which have been—
(I) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or
(ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

The regulations promulgated by the Secretary reiterate the provisions of ESA § 4(a)(1) and

(b)(1).[29] It has been stated that "[t]he ultimate goal of the ESA is to recover listed species

---

[28] 16 U.S.C. § 1533(b)(1)

[29] *See* 50 CFR § 424.11(b), (c) *Factors for listing, delisting, or reclassifying species* (10-1-12).

to the point where they no longer need ESA protection."[30] It is within this general framework that this Court must resolve the issue before it.

## C.    *Effect of Listing*

NMFS is authorized to issue such regulations as it may consider necessary and advisable for the preservation of a listed species.[31] The ESA further provides that concurrently with the listing as threatened or endangered, the Secretary "shall . . . designate any habitat of such species which is then considered to be critical habitat."[32] The listing of a species as threatened triggers several protective provisions.[33] The most recent edition of C.F.R. Part 223 (October 1, 2013) does not itself contain any provision generally or specifically regulating activities affecting the Arctic ringed seal. It does, however, note that the provisions therein "are in addition to, and not in lieu of, other regulations of parts 222 through 226 of this chapter which prescribe additional restrictions or conditions governing threatened species."[34] Of these, only Part 222, which applies to both threatened and endangered species,[35] applies to this case.[36] In this case, the only apparent provision

---

[30]    *Western Watersheds Project v. Ashe*, 948 F. Supp.2d 1166, 1171 (D. Idaho 2013) (citing 16 U.S.C. §§ 1531(b)–(c), 1532(3)).

[31]    ESA § 4(d) [16 U.S.C. § 1533(d)].

[32]    ESA § 4(a)(3)(A) [16 U.S.C. § 1533(a)(3)(A)].

[33]    *See* 50 C.F.R. § 223.101(a) (10-1-12) (stating that the purpose and scope of the regulations is to provide for conservation of threatened species by establishing rules and procedures to govern activities involving them).

[34]    50 C.F.R. § 223.101(c) (10-1-2013).

[35]    Governing "the taking, possession, transportation, sale, purchase, barter, exploration, importation of, and other requirements to wildlife . . . determined to be
(continued...)

that may be applicable is the general permitting procedures.[37] However, the regulations also specifically provide that a permit is required solely for threatened species to which the Secretary has applied the limitations of ESA § 9(a)[38] by regulation.[39]

Although it was initially proposed to apply ESA § 9(a) to the listing of the Arctic ringed seal, in promulgating the Listing Rule NMFS determined that such regulations were unnecessary.[40] NMFS concluded that, because § 9(a) prohibitions would not provide appreciable conservation benefits and they could be adopted in the future if necessary, it was unnecessary to adopt them at this time.[41] NMFS specifically noted:

> Section 7(a)(2) of the ESA requires Federal agencies to consult with us to ensure that activities they authorize, fund, or conduct are not likely to jeopardize the continued existence of a listed species or a species proposed for listing, or to adversely modify critical habitat or proposed critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency must enter into consultation with us. Examples of Federal actions that may affect Arctic ringed seals include permits and authorizations relating to coastal development and habitat alteration, oil and

---

[35](...continued)
threatened or endangered pursuant to section 4(a) of the Act." 50 C.F.R. § 222.101(a) (10-1-2013).

[36] Part 224 applies to endangered species with no apparent application in this case. Part 225 is reserved. Part 226 designates critical habitat for various species, but does not designate any critical habitat for the Arctic ringed seal.

[37] 50 C.F.R. §§ 222.301, *et seq.*

[38] 16 U.S.C. § 1538(a).

[39] 50 C.F.R. § 222.301(b).

[40] 77 Fed. Reg. 76718.

[41] *Id.*

gas development (including seismic exploration), toxic waste and other pollutant discharges, and cooperative agreements for subsistence harvest.[42]

NMFS summarized the factors it considered in listing the Arctic ringed seals as threatened. With respect to sea ice and snow cover NMFS found:

> *Arctic ringed seal:* In the East Siberian, Chukchi, Beaufort, Kara-Laptev, and Greenland Seas, as well as in Baffin Bay and the Canadian Arctic Archipelago, little or no decline in ice extent is expected in April and May during the remainder of this century. In most of these areas, a moderate decline in sea ice is predicted during June within this century; while substantial declines in sea ice are projected in July and November after mid-century. The central Arctic (defined as regions north of 80°N. latitude) also shows declines in sea ice cover that are most apparent in July and November after 2050. For Hudson Bay, under a warmer climate scenario (for the years 2041–2070) Joly *et al.* (2010) projected a reduction in the sea ice season of 7–9 weeks, with substantial reductions in sea ice cover most apparent in July and during the first months of winter.
>
> In the Bering Sea, April and May ice cover is projected to decline throughout this century, with substantial interannual variability forecasted in the eastern Bering Sea. The projection for May indicates that there will commonly be years with little or no ice in the western Bering Sea beyond mid-century. Very little ice has remained in the eastern Bering Sea in June since the mid-1970s. Sea ice cover in the Barents Sea in April and May is also projected to decline throughout this century, and in the months of June and July, ice is expected to disappear rapidly in the coming decades.
>
> Based on model projections, April snow depths over much of the range of the Arctic ringed seal averaged 25–35 cm in the first decade of this century, consistent with on-ice measurements by Russian scientists (Weeks, 2010). By mid-century, a substantial decrease in areas with April snow depths of 25–35 cm is projected (much of it reduced to 20–25 cm). The deepest snow (25–30 cm) is forecasted to be found just north of Greenland, in the Canadian Arctic Archipelago, and in an area tapering north from there into the central Arctic Basin. Southerly regions, such as the Bering Sea and Barents Sea, are forecasted to have snow depths of 5 cm or less by mid-century. By the end of the century, April snow depths of 20–25 cm are forecasted only for a portion of the central Arctic, most of the Canadian Arctic Archipelago, and a few small isolated areas in a few other regions. Areas

---

[42] *Id.*

with 25–30 cm of snow are projected to be limited to a few small isolated pockets in the Canadian Arctic by 2090–2099.[43]

After an extensive analysis of the general effects of change in ice and snow cover

on ringed seals, NMFS concluded:

> *Arctic ringed seal*:  The depth and duration of snow cover is projected to decrease throughout the range of Arctic ringed seals within this century. Whether ringed seals will continue to move north with retreating ice over the deeper, less productive Arctic Basin waters and whether forage species that they prey on will also move north is uncertain and speculative (see additional discussion below). Initially, it is possible that impacts will be somewhat ameliorated if the subspecies' range retracts northward with its sea ice habitats. By 2100, however, April snow cover is forecasted to become inadequate for the formation and occupation of ringed seal birth lairs over much of the subspecies' range. Thus, even if the range of the Arctic ringed seal contracts northward, by 2100 April snow cover suitable for birth lairs is expected to be limited to a portion of the central Arctic, most of the Canadian Arctic Archipelago, and a few other small isolated areas. The projected decreases in ice and, especially, snow cover are expected to lead to increased pup mortality from premature weaning, hypothermia, and predation.[44]

After considering the foregoing factors and ocean acidification, NMFS summarized:

> Climate models consistently project overall diminishing sea ice and snow cover at least through the current century, with regional variation in the timing and severity of those losses. Increasing atmospheric concentrations of greenhouse gases, including $CO_2$, will drive climate warming and increase acidification of the ringed seal's ocean and lake habitats. The impact of ocean warming and acidification on ringed seals is expected to be primarily through changes in community composition. The precise extent and timing of these changes is uncertain, yet the overall trend is clear:  Ringed seals will face an increasing degree of habitat modification through the foreseeable future.
>
> Diminishing ice and snow cover are the greatest challenges to persistence of all of the ringed seal subspecies. While winter precipitation is

---

[43]  77 Fed. Reg. 76708.

[44]  77 Fed. Reg. 76710.

forecasted to increase in a warming Arctic, the duration of ice cover is projected to be substantially reduced, and the net effect will be lower snow accumulation on the ice. Within the century, snow cover adequate for the formation and occupation of birth lairs is forecasted to occur in only parts of the Canadian Arctic Archipelago, a portion of the central Arctic, and a few small isolated areas in other regions. Without the protection of lairs, ringed seals, especially newborns, are vulnerable to freezing and predation. We conclude that the ongoing and projected changes in sea ice habitat pose significant threats to the persistence of each of the five subspecies of the ringed seal and are likely to curtail the range of the species substantially within the foreseeable future.[45]

With respect to utilization for commercial, subsistence, recreational, scientific or educational purposes, NMFS concluded: "that there is no evidence that overutilization of ringed seals is occurring at present."[46] NMFS considered the risk of disease as low, and "the threat posed to ringed seals by predation is currently moderate, but predation risk is expected to increase as snow and ice conditions change with a warming climate."[47] With respect to pollution and contaminants, oil and gas industry, fisheries, and shipping NMFS concluded: "We find that the threats posed by pollutants, oil and gas activities, fisheries, and shipping do not individually or collectively place the Arctic or Okhotsk subspecies of ringed seals at risk of becoming endangered in the foreseeable future."[48] The analysis of demographic risks concluded:

Within the foreseeable future, the BRT judged the risks to Arctic ringed seal persistence to be moderate (diversity and abundance) to high (productivity and spatial structure). As noted above, the impacts to Arctic ringed seals

---

[45] 77 Fed. Reg. 76711.

[46] *Id.*

[47] *Id.*

[48] 77 Fed. Reg. 76714.

may be somewhat ameliorated initially if the subspecies' range retracts northward with sea ice habitats, but by the end of the century snow depths are projected to be insufficient for lair formation and maintenance throughout much of the subspecies' range, including the potentially retracted northward one.[49]

Although the Listing Rule discussed conservation efforts with respect to the Arctic ringed seals in general, it made neither findings nor drew conclusions from conservation efforts, internationally or domestically. It did note, however, that a co-management agreement with Alaska Natives to monitor subsistence harvesting and cooperate research and education programs pertaining to seals existed, and that NMFS's national marine mammal Laboratory is engaged in an active research program to enhance the understanding of risk factors affecting ringed seals to improve the ability to develop effective management measures for the species.[50]

The Listing Rule concluded:

*Arctic subspecies*: (1) There are no specific estimates of population size available for the Arctic subspecies, but most experts postulate that the population numbers in the millions. (2) The depth and duration of snow cover are forecasted to decrease substantially throughout the range of the Arctic ringed seal. Within this century, snow cover is forecasted to be inadequate for the formation and occupation of birth lairs over most of the subspecies' range. (3) Because ringed seals stay with the ice as it annually advances and retreats, the southern edge of the ringed seal's range may initially shift northward. Whether ringed seals will continue to move north with retreating ice over the deeper, less productive Arctic Basin waters and whether the species that they prey on will also move north is uncertain. (4) The Arctic ringed seal's pupping and nursing seasons are adapted to the phenology of ice and snow. The projected decreases in sea ice, snow cover, and thermal capacity of birthing lairs will likely lead to decreased pup survival. Thus,

---

[49] 77 Fed. Reg. 76715.

[50] 77 Fed. Reg. 76715–16.

within the foreseeable future it is likely that the number of Arctic ringed seals will decline substantially, and they will no longer persist in substantial portions of their range. We have determined that the Arctic subspecies of the ringed seal is not in danger of extinction throughout all of its range, but is likely to become so within the foreseeable future. Therefore, we are listing it as threatened.[51]

### D.    *Arguments*

The Northern Alaska Plaintiffs contend that the use of a foreseeable future extending out 100 years was arbitrary and capricious in that it used climate modeling that NMFS had previously concluded was too uncertain and unreliable, and that NMFS failed to provide a rational connection between the limited scientific data available and its decision.

The State also contends that the application of the foreseeable future period beyond 50 years was arbitrary and capricious. Additionally, the State argues that NMFS failed to provide an adequate response under ESA § 4(I).

AOGA/API also joins the argument that the use of the 100-year foreseeable future was improper. They also contend that NMFS has not, indeed cannot, project the magnitude of the risk of extinction to Arctic ringed seals.

### E.    *Analysis*

The parties agree that the Listing Rule relied principally, if not solely, upon climate change as the governing factor for listing the Arctic ringed seals as threatened.[52] It is also undisputed that, under the regulations, climate change is not only a factor properly

---

[51]  77 Fed. Reg. 76716.

[52]  *See* 77 Fed. Reg. 76707.

considered, but that a listing may be made on any one of the factors alone.[53] It is further

undisputed that the term "foreseeable future" is not defined by either statute or regulation;

accordingly, the agency defines it on a case-by-case basis in each listing decision.[54] With

that general background, the Court will address the issues raised: first the procedural

issue, then the substantive issues.

### 1. Procedural Issue

The State contends that NMFS failed to adequately respond to the State's

comments. Section 4(I) of the EPA[55] provides in relevant part that where, as here, a State

has filed comments disagreeing with the proposed regulation, "the Secretary shall submit

to the State agency a written justification for his failure to adopt regulations consistent with

the agency's comment or petition."[56]

Initially, the State contends that the State failed to provide a *separate* written

justification relying on this Court's prior decision in *Salazar*.[57] The Ninth Circuit having

specifically rejected that argument in *Salazar*,[58] this Court must also reject it in this case.

---

[53] 50 C.F.R. § 424.11(c) (10-1-12).

[54] *See In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation – MDL No. 1993*, 709 F.3d 1, 15 (D.C. Cir.), *cert. denied sub nom. Safari Club Int'l. v. Jewell*, 134 S. Ct. 310 (2013).

[55] 16 U.S.C. § 1533(I)

[56] *See* 50 C.F.R. § 424.18(c) (10-1-12) (containing identical language).

[57] *Alaska Oil and Gas Ass'n v. Salazar*, 916 F. Supp.2d 974, 1003 (D. Alaska 2013), *reversed and remanded sub nom., Alaska Oil and Gas Ass'n v. Jewell*, ___ F.3d ___, 2016 WL 766855 (9th Cir. Feb. 29, 2016).

[58] *Jewell*, ___ F.3d at ___, 2016 WL 766855 at *14.

The State also argues that the NMFS responses were inadequate in four particulars: (1) failed to consider or respond to two independent studies submitted or referred to by the State; (2) adequately address comments regarding the current abundance and health of the Arctic ringed seal; (3) adequately address the State's comment pointing out the historic resilience of the ringed seal or its ability to adapt to changed climatic conditions over a nine or ten generational span; and (4) in using a 100-year forecast, did not adequately respond to the departure from its historic use of a 50-year forecast.

This Court rejects the State's argument as to (2), (3), and (4). NMFS did respond to those comments. Reduced their essence, the State's "objections" for the most part addressed a disagreement with the sufficiency of the content of the responses. The Ninth Circuit made clear in *Jewel* that in the context of weighing the adequacy of an agency's response "a court will not analyze the sufficiency of [NMFS's] responses."[59] As to point (1) a slightly different scenario exists. The State refers to two independent studies:  (1) a study of ringed seals in Hudson Bay showing that the health of ringed seals is better in the 2000's than it was in the 1990's when it was colder and there was more ice; and (2) an Alaska industry group ecosystem studies or Bureau of Ocean Energy Management, Regulation, and Enforcement studies cited in AFDG's comment letters. The Court will address the two points *in seriatim*.

In response to the Hudson Bay studies, implicitly acknowledging that the study cited by the State had not been specifically cited, NMFS argues that its summary of comments

---

[59] *Id.*

indicated that it had thoroughly reviewed "all 'peer-reviewed journal articles, technical reports, and references to scientific literature' provided and those not specifically mentioned in the response to comments had been 'considered previously or did not alter our determinations regarding the status of the four ringed seal subspecies.'"[60] In response, the State argues that this generic response is insufficient to show that it actually reviewed the study's key findings *vis-a-vis* the declination during the heavy ice conditions and increase during periods of less sea ice.[61]

While NMFS's response was perhaps technically deficient, the State's argument still fails. Even assuming that NMFS did not consider that particular study, the State fails to advance *any* argument that the failure had any material bearing on the ultimate decision, based on projections occurring at some point after the year 2050. To require an agency to specifically respond to each and every study referenced by the State by name simply exalts form over substance. Particularly where, as in this case, the study in question had little, if any, material relevance to the ultimate decision addressing projected conditions a hundred years in the future.[62]

In response to the failure to respond to the Alaska industry group studies, NMFS argues that, because the State simply provided links to websites without identifying any specific, relevant study the State believed NMFS should have considered. NMFS contends

---

[60] NMFS Opposition, Docket 60, p. 60 (citation to the record omitted).

[61] State Reply, Docket 66, p. 12.

[62] The Court notes that the State does not advance any argument as to the materiality of the omitted material, in particular how its consideration *might have* changed the decision.

that this constituted a waiver of that point.[63] In response, the State simply argues that in

2011 NMFS could have accessed the URLs provided and located the studies referenced.[64]

The URL identified by the State in its comment, http://alaska.boemre.gov/ess/index.htm,[65]

is a general index.

In its Reply the State, after acknowledging that the URL cited has been superceded,

states:[66]

> The link to the new website, www.BOEM.gov, brings up the agency's main
> page, with a tab for "Environmental Stewardship," which includes a link to
> "Environmental Studies," where the ADFG-referenced reports and data can
> be accessed. The industry website states that the marine mammals studies
> have been moved to a new webpage—www.chukchiscience.com.[42] Links to
> the studies are available there under "Study the Science."
>
> [42] *See* http://alaska.conocophillips.com/EN/sustainable/environment/Pages/studies.aspx.

The Court agrees with NMFS that in failing to name specific, relevant studies the

State waived any objection to the failure to consider that material. Given the volume of

material that NMFS must review and consider in the rule adoption process,[67] it is simply

unrealistic to expect a federal agency to search an index to ascertain where the material

---

[63] NMFS Opposition, *supra*.

[64] State Reply, *supra*.

[65] AR 3007851.

[66] State Reply, *supra*, pp. 12–13.

[67] The Court notes that in this case, NMFS received 5,294 comment submissions
in the form of letters via mail, fax and electronically; testimony from 41 people and written
submissions from 12 people at three public hearings; plus comments from State and
Federal Agencies, foreign government agencies, native organizations, environmental
groups, industry groups, and other interested persons. 77 Fed. Reg. 76719.

to which a comment refers may be found. Had the State included in its comments the detail it presents in its Reply, NMFS would not have had a basis upon which to ignore it.

## 2. Substantive Issues

Initially the Court notes that, in a case involving the Beringia DPS of bearded seals, it previously held under the facts of that case, that the use of a 100-year projection was not within the *reasonably* foreseeable future.  In that case, after finding that under the facts presented, forecasting more than 50 years into the future was simply too remote and speculative to support a determination that the bearded seal was in danger of becoming extinct.[68]  The Court concluded:

> After reviewing the voluminous record and applicable case law the Court has determined that the action of NMFS in listing the Beringia DPS of bearded seals was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[Fn omitted]  In particular, with respect to two factors: (1) the lack of any articulated discernable, quantified threat of extinction within the *reasonably* foreseeable future; and (2) the express finding that, because existing protections were adequate, no further protective action need be taken at this time.  Listing the Beringia DPS as "endangered" had no effect except to require all federal agencies to consult with NMFS before carrying out any action that might jeopardize the continued existence of the Beringia DPS throughout its range.  A listing under the ESA based upon speculation, that provides no additional action intended to preserve the continued existence of the listed species, is inherently arbitrary and capricious.[69]

The Court, however, also specifically noted:

> This Court is *not* holding that the use of projections that extend out more than 50 years is impermissible in all cases.  The Court's holding today

---

[68] *Alaska Oil & Gas Ass'n v. Blank*, Case No. 4:13-cv-00018-RRB, Docket 78, p. 31 (hereinafter "*Seal I*").

[69] *Id.*, pp. 31–32.

is limited to the facts presented in the record before it, i.e., that an unknown, unquantifiable population reduction, which is not expected to occur until nearly 100 years in the future, is too remote and speculative to support a listing as threatened. If it were to hold otherwise, such a holding could logically render every species in the arctic and sub-arctic areas potentially "threatened."[70]

Appeals from that decision are presently pending before the Ninth Circuit.[71]

Thus, the threshold issue before the Court in this case is whether, in light of its earlier decision and applying the doctrine of *stare decisis*, it should reach a different result based upon the facts presented. For the following reasons the Court is of the opinion that it should not.

Throughout its listing rule NMFS uses the term "foreseeable future." NMFS defined foreseeability in general terms as:

The foreseeability of a species' future status is case specific and depends upon both the foreseeability of threats to the species and foreseeability of the species' response to those threats. When a species is exposed to a variety of threats, each threat may be foreseeable over a different time frame. For example, threats stemming from well-established, observed trends in a global physical process may be foreseeable on a much longer time horizon than a threat stemming from a potential, though unpredictable, episodic process such as an outbreak of disease that may never have been observed to occur in the species.

The principal threat to ringed seals is habitat alteration stemming from climate change. In the 2008 status review for the ribbon seal (Boveng *et al.,* 2008; see also 73 FR 79822, December 30, 2008), NMFS scientists used the same climate projections used in our risk assessment for ringed seals (which is summarized in the preamble to this final rule), and analyzed threats associated with climate change through 2050. One reason for that approach was the difficulty of incorporating the increased divergence and uncertainty in climate scenarios beyond that time. Other reasons included the lack of data for threats other than those related to climate change beyond 2050, and

---

[70]  *Id.*, p.31, note 69.

[71]  Ninth Circuit Nos. 14-35806, 14-35811.

the fact that uncertainty embedded in the assessment of the ribbon seal's response to threats increased as the analysis extended farther into the future.

Since completing the analysis for ribbon seals, with its climate impact analysis, NMFS scientists have revised their analytical approach to the foreseeability of threats due to climate change and responses to those threats, adopting a more threat-specific approach based on the best scientific and commercial data available for each respective threat. For example, because the climate projections in the Intergovernmental Panel on Climate Change's (IPCC's) *Fourth Assessment Report* (AR4; IPCC, 2007) extend through the end of the century (and we note the IPCC's *Fifth Assessment Report* (AR5), due in 2014, will extend even farther into the future), for our analysis of ringed seals we used the same models to assess impacts from climate change through 2100. We continue to recognize that the farther into the future the analysis extends, the greater the inherent uncertainty, and we incorporated that limitation into our assessment of the threats and the species' response. For other threats, where the best scientific and commercial data do not extend as far into the future, such as for occurrences and projections of disease or parasitic outbreaks, we limited our analysis to the extent of such data. This threat-specific approach creates a more robust analysis of the best scientific and commercial data available. It is also consistent with the memorandum issued by the Department of Interior, Office of the Solicitor, regarding the meaning of the term "foreseeable future" (Opinion M–37021; January 16, 2009).[72]

In response to an objection projecting through the end of the 21st century, NMFS

stated:

*Comment 9*:  A peer reviewer expressed the view that climate model predictions should not be considered beyond mid-century because they rely on assumptions about future policy decisions that will affect GHG emissions and are thus highly speculative. Related public comments, including from the State of Alaska, noted that NMFS's recent ESA listing determination for the ribbon seal and a subsequent court decision concluded that projections of climate scenarios beyond 2050 are too heavily dependent on socioeconomic assumptions and are therefore too divergent for reliable use in assessing threats to the species. Two reviewers and several commenters expressed the opinion that trying to predict the response of seals to environmental change beyond mid-century increases the uncertainty unreasonably. A

---

[72]  77 Fed. Reg. 76707.

reviewer and several public comments also pointed out that assessing impacts to ringed seals from climate change through the end of this century is inconsistent with: (1) Other recent ESA determinations for Arctic species, such as ribbon seal and polar bear, that considered species responses through mid-century; (2) the IUCN red list process, which uses a timeframe of three generation lengths; and (3) the mid-century timeframe considered to evaluate environmental responses of marine mammals to climate change in a special issue (March 2008) of the journal Ecological Applications (Walsh, 2008). A few commenters expressed the opinion that the altered approach is significant because the listing determinations are wholly dependent upon NMFS's use of a 100-year foreseeable future. Several commenters expressed the opinion that inadequate justification was provided for NMFS's use of a 100-year foreseeable future. Many of these commenters suggested that the best scientific data support a "foreseeable future" time frame of no more than 50 years, and some commenters such as the State of Alaska suggested a shorter time horizon of no more than 20 years. In contrast, another peer reviewer and some commenters expressed support for use of climate model projections through the end of the 21st century.

   *Response:* The ESA requires us to make a decision as to whether the species under consideration is in danger of extinction throughout all or a significant portion of its range (endangered), or is likely to become endangered within the foreseeable future throughout all or a significant portion of its range (threatened) based on the best scientific and commercial data available. While we may consider the assessment processes of other scientists (*i.e.,* IUCN; Walsh, 2008), we must make a determination as to whether a species meets the definition of threatened or endangered based upon an assessment of the threats according to section 4 of the ESA. We have done so in this rule, using a threat-specific approach to the "foreseeable future" as discussed below and in the proposed listing rule.

   In the December 30, 2008, ribbon seal listing decision (73 FR 79822) the horizon of the foreseeable future was determined to be the year 2050. The reasons for limiting the review to 2050 included the difficulty in incorporating the increased divergence and uncertainty in future emissions scenarios beyond this time, as well as the lack of data for threats other than those related to climate change beyond 2050, and that the uncertainty inherent in assessing ribbon seal responses to threats increased as the analysis extended farther into the future. By contrast, in our more recent analyses for spotted, ringed, and bearded seals, we did not identify a single specific time as the foreseeable future. Rather, we addressed the foreseeable future based on the available data for each respective threat. This approach better reflects real conditions in that some threats (*e.g.,* disease outbreaks) appear more randomly through time and are therefore

difficult to predict, whereas other threats (climate change) evince documented trends supported by paleoclimatic data from which reasonably accurate predictions can be made farther into the future. Thus, the time period covered for what is reasonably foreseeable for one threat may not be the same for another. The approach is also consistent with the memorandum issued by the Department of Interior, Office of the Solicitor, regarding the meaning of the term "foreseeable future" (Opinion M–37021; January 16, 2009). In consideration of this modified threat-specific approach, NMFS initiated a new status review of the ribbon seal on December 13, 2011 (76 FR 77467).

As discussed in the proposed listing rule, the analysis and synthesis of information presented in the IPCC's AR4 represents the scientific consensus view on the causes and future of climate change. The IPCC's AR4 used state-of-the-art AOGCMs under six "marker" scenarios from the Special Report on Emissions Scenarios (SRES; IPCC, 2000) to develop climate projections under clearly stated assumptions about socioeconomic factors that could influence the emissions. Conditional on each scenario, the best estimate and likely range of emissions were projected through the end of the 21st century. In our review of the status of the ringed seal, we considered model projections of sea ice developed using the A1B scenario, a medium "business-as-usual" emissions scenario, as well the A2 scenario, a high emissions scenario, to represent a significant range of variability in future emissions.

We also note that the SRES scenarios do not assume implementation of additional climate initiatives beyond current mitigation policies. This is consistent with consideration of "existing" regulatory mechanisms in our analysis under ESA listing Factor D. It is also consistent with our Policy on Evaluating Conservation Efforts (68 FR 15100; March 28, 2003), which requires that in making listing decisions we consider only formalized conservation efforts that are sufficiently certain to be implemented and effective.

The model projections of global warming (defined as the expected global change in surface air temperature) out to about 2040–2050 are primarily due to emissions that have already occurred and those that will occur over the next decade. Thus conditions projected to mid-century are less sensitive to assumed future emissions scenarios. For the second half of the 21st century, however, the choice of an emissions scenario becomes the major source of variation among climate projections. As noted above, in our 2008 listing decision for ribbon seal, the foreseeable future was determined to be the year 2050. The identification of mid-century as the foreseeable future took into consideration the approach taken by FWS in conducting its status review of the polar bear under the ESA, and the IPCC

assertion that GHG levels are expected to increase in a manner that is largely independent of assumed emissions scenarios until about the middle of the 21st century, after which the emissions scenarios become increasingly influential.

Subsequently, in the listing analyses for spotted, ringed, and bearded seals, we noted that although projections of GHGs become increasingly uncertain and subject to assumed emissions scenarios in the latter half of the 21st century, projections of air temperatures consistently indicate that warming will continue throughout the century. Although the magnitude of the warming depends somewhat on the assumed emissions scenario, the trend is clear and unidirectional. To the extent that the IPCC model suite represents a consensus view, there is relatively little uncertainty that warming will continue. Because sea ice production and persistence is related to air temperature through well-known physical processes, the expectation is also that loss of sea ice and reduced snow cover will continue throughout the 21st century. Thus, the more recent inclusion of projections out to the year 2100 reflects NMFS's intention to use the best and most current data and analytical approaches available. AOGCM projections consistently show continued reductions in ice extent and multi-year ice (ice that has survived at least one summer melt season) throughout the 21st century (*e.g.,* Holland *et al.,* 2006; Zhang and Walsh, 2006; Overland and Wang, 2007), albeit with a spread among the models in the projected reductions. In addition, as discussed by Douglas (2010), the observed rate of Arctic sea ice loss has been reported as greater than the collective projections of most IPCC-recognized AOGCMs (*e.g.,* Stroeve *et al.,* 2007; Wang and Overland, 2009), suggesting that the projections of sea ice declines within this century may in fact be conservative.

We concluded that in this review of the status of the ringed seal, the climate projections in the IPCC's AR4, as well as the scientific papers used in this report or resulting from this report, represent the best scientific and commercial data available to inform our assessment of the potential impacts from climate change. In our risk assessment for ringed seals, we therefore considered the full 21st century projections to analyze the threats stemming from climate change. We continue to recognize that the farther into the future the analysis extends, the greater the inherent uncertainty, and we incorporated that consideration into our assessments of the threats and the species' responses to the threats.[73]

---

[73] 77 Fed. Reg. 76722–23.

NMFS essentially acknowledged that it lacks sufficient data on the resilience of Arctic bearded seals to cope with climatic changes,[74] or to define an extinction threshold for bearded seals and assessing the probability of reaching that threshold within a specified time prior to the end of the century.[75] NMFS also acknowledged that, because the existing body of information regarding bearded seal population and trends was limited, additional studies were needed to understand the population dynamics and habitat of the bearded seal.[76]

It does not appear from the Listing Rule that any serious threat of a reduction in the population of the Arctic ringed seal, let alone extinction, exists prior to the last decade of the 21st century. This is troubling. Indeed, the Listing Rule itself concedes that, at least through mid-21st century, there is little threat to the population level of the Arctic ringed seal. With respect to the second half of the century it appears that no significant threat to the Arctic ringed seal is contemplated until sometime after 2050, but somewhere around 2090–2100. Even as to that date, NMFS acknowledges that it lacks any reliable data as to the actual impact on the bearded seal population as a result of the loss of sea-ice. Under the facts in this case, forecasting more than some 80 years into the future is simply

---

[74] 77 Fed. Reg. 76726 (response to Comment 23).

[75] 77 Fed. Reg. 76716, 76728 (response to Comment 29).

[76] 77 Fed. Reg. 76728 (response to Comment 30).

too speculative and remote to support a determination that the bearded seal is in danger of becoming extinct.[77]

## VI.  CONCLUSION/ORDER

After reviewing the voluminous record, applicable case law, and its prior decision in *Seal I*, the Court has determined that, as with the Beringia DPS of bearded seals, the action of NMFS in listing the Arctic ringed seals was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[78] In particular, the Court reaches this conclusion based on two factors: (1) the lack of any articulated discernable, quantified threat of extinction within the reasonably foreseeable future; and (2) the express finding by NMFS that (a) the proposed protective regulations for threatened subspecies of the ringed seal were not necessary or advisable for the conservation of the Arctic ringed seal at this time and (b) the existing protections under the Marine Mammal Protection Act made it unlikely that the proposed protective regulations would provide appreciable conservation benefits.  Listing the Arctic ringed seal as "endangered" has no effect except to require all federal agencies to consult with NMFS before carrying out any action that might jeopardize the continued existence of the Arctic ringed seal throughout its range. A listing under the

---

[77]  As in *Seal I* this Court is *not* holding that the use of projections that extend out more than 50 years is impermissible in all cases. The Court's holding today is limited to the facts presented in the record before it, i.e., that an unknown, unquantifiable population reduction, which is not expected to occur until nearly 100 years in the future, is too remote and speculative to support a listing as threatened. If it were to hold otherwise, such a holding could logically render every species in the arctic and sub-arctic areas potentially "threatened."

[78]  5 U.S.C. § 706(2)(A).

ESA based upon an un-quantified threat of extinction that may occur more than 50 years in the future that provides no additional action intended to preserve the continued existence of the listed species, is inherently arbitrary and capricious.

Where, as here, the agency's action is found to be arbitrary and capricious, the appropriate action is to remand to the agency.[79] "[V]acatur of an unlawful agency rule normally accompanies a remand."[80]

There is nothing, of course, to prevent NMFS from revisiting this matter if circumstances later develop to suggest that the Arctic ringed seal may become threatened in the "reasonably foreseeable future."

Therefore, Plaintiffs' Motions for Summary Judgment at **Dockets 42, 50, and 54** are hereby **GRANTED**. The Cross-Motions of Defendants at **Dockets 60 and 63** are hereby **DENIED**. The final rule is hereby **VACATED** to the extent it affects the Arctic ringed seal (the *Phoca hispida hispida* subspecies) and **REMANDED** to NMFS to correct the aforementioned deficiencies.

The Clerk of the Court is directed to enter final judgment accordingly.

**IT IS SO ORDERED** this 11th day of March, 2016.

S/ RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE

---

[79] *Nat'l Ass'n of Homebuilders*, 551 U.S. at 657–58.

[80] *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1185–86 (9th Cir. 2004).